UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAM BA NGUYEN,<br><br>             Plaintiff,<br><br>        v.<br><br>CALIFORNIA PRISON HEALTH<br>SERVICE, et al.,<br><br>             Defendants. | No.  2:13-cv-963-MCE-EFB P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding pro se and in forma pauperis in an action brought under 42 U.S.C. § 1983.  He has filed a second amended complaint, ECF No. 50, which incorporates the relevant allegations and supporting documents from his amended complaint, ECF No. 15.  In his amended complaint, he asserts a claim for deliberate indifference to medical needs against defendants M. Osman, M.D., and Sherman Champen, nurse practitioner ("defendants").  Plaintiff generally alleges that defendants improperly diagnosed and/or treated facial and shoulder injuries, their associated pain, and his inability to chew properly.

Defendants move for summary judgment, ECF No. 63, generally contending that they provided adequate and timely care for all of plaintiff's medical needs.  As discussed below, their motion for summary judgment should be granted.

/////

/////

1

1  **I.      Background**

2          **A.      Factual Background**

3          Plaintiff is currently in the custody of U.S. Immigration and Customs Enforcement; he

4  was an inmate at California Medical Facility ("CMF") at all times relevant to his second amended

5  complaint.  ECF No. 50 at 4.  Dr. Osman worked at CMF as a physician and surgeon.  ECF No.

6  63-4 ¶ 3.  Champen worked at CMF as a nurse practitioner.  ECF No. 63-3 ¶ 3.  Champen was

7  one of plaintiff's primary care providers between June and August 2010.  *Id.*; ECF No. 71 ¶ 8.

8          On or about January 19, 2010, plaintiff received an MRI on his left shoulder.  ECF No. 15

9  at 43–44.  He was found to have an injury to his left shoulder, which was diagnosed as a

10  "moderate glenohumeral arthrosis with possible 2 loose bodies."  *Id.*  Subsequently, nondefendant

11  Dr. Sabin ordered him to take two acetaminophen, or regular Tylenol, tablets twice a day as

12  needed for pain caused by this condition.  ECF No. 71-1 at 10–11; *see also* ECF No. 15 at 61.  He

13  wrote one such prescription for twenty-five days on May 13, 2010.  ECF No. 71-1 at 11.

14          On May 21, 2010, plaintiff had an altercation with another inmate.  ECF No. 15 at 37.

15  Around 4:30 a.m., the inmate attacked him in his sleep.  *Id.* at 5, 34.  Then, around 10:00 a.m.,

16  there was a related incident in which plaintiff and the other inmate were burned by hot water.  *Id.*

17  at 34–35.

18          Following the altercation, plaintiff was taken to a holding cell pending placement in

19  administrative segregation ("Ad-seg").  ECF No. 71-1 at 5.  On that day, Dr. Osman was working

20  as a physician in the emergency room at CMF, where he was tasked with clearing inmates for Ad-

21  seg.  ECF No. 63-4 ¶ 3.  He examined plaintiff and found him to have cuts and bruises on his face

22  and a burn on his hand.  *Id.* ¶ 4.  He asked him how he received these injuries; plaintiff refused to

23  disclose their origin and requested treatment for only his burned hand.  *Id.*; *see also* ECF No. 15

24  at 39; ECF No. 63-2 ("Pl.'s Dep.") at 16–19. [1]  Dr. Osman ordered daily bandage changes and

25

26          [1] Plaintiff essentially argues that defendants should not be able to use his deposition transcript as
evidence because they did not give him a copy of it.  *See* ECF No. 70 at 1–2.  He is mistaken.  Defendants

27  did not have an automatic duty to give him a copy of the deposition transcript.  *See* Fed. R. Civ. P.
30(f)(3).  Furthermore, the deposition transcript is cited herein only once for a proposition that other

28  evidence supports.  Accordingly, this argument fails.

antibiotics for the hand for seven days, cetirizine and tetanus shots, and a shot of four milligrams of morphine for pain.  ECF No. 63-4 ¶ 4.  He also ordered Tylenol with codeine ("Tylenol 3") for pain.  *Id.*; ECF No. 63-3 at 44; ECF No. 71-1 at 11.

On May 22 and 26, 2010, plaintiff received treatment for his burned hand from at least two nurses, including nondefendant Jolley, a nurse practitioner.  ECF No. 71-1 at 13–15.  Jolley prescribed ibuprofen for ten days.  *Id.* at 17.  Plaintiff contends that the ibuprofen was to treat jaw pain that he felt while chewing food.  *Id.* at 12.

On June 2, 2010, Champen examined plaintiff.  ECF No. 63-3 ¶ 5; ECF No. 71 ¶ 8.  Plaintiff complained of chronic shoulder pain.  ECF No. 63-3 ¶ 5.  Champen reviewed the MRI of his shoulder and requested a consultation with an orthopedic surgeon.  *Id.*; ECF No. 71 ¶ 8.  Plaintiff also complained of facial pain.  ECF No. 63-3 ¶ 5; ECF No. 71 ¶ 9.  Champen saw signs of trauma on his face, including swelling under the right eye.  ECF No. 63-3 ¶ 5.  Further, Champen states that plaintiff complained of blurred vision and headaches.  *Id.*  Thus, Champen ordered urgent X-rays of plaintiff's face, particularly around the eyes, to rule out serious problems such as cerebral edema or brain swelling.  *Id.*  Additionally, Champen prescribed Tylenol 3 for ten days for facial pain.  *Id.*; *see also* ECF No. 71 ¶ 9; ECF No. 71-1 at 19.  Moreover, Champen ordered a follow-up visit in two weeks.  ECF No. 63-3 ¶ 5; ECF No. 71 ¶ 9.

At the same visit, Champen stopped the prescription for regular Tylenol that Dr. Sabin ordered.  ECF No. 71-1 at 17.  He also stopped Jolley's prescription for ibuprofen.  *Id.*  Plaintiff seems to contend that Champen stopped the prescription for ibuprofen because he complained that jaw pain prevented him from chewing properly and that the resultant lack of food made the ibuprofen hurt his stomach.  *See* ECF No. 15 at 60; ECF No. 71 ¶ 9.

The parties dispute certain details of this visit.  Plaintiff contends that Champen told him that the X-rays would be done in a couple of days, if not within four hours.  ECF No. 71 ¶ 9.  However, Champen asserts that he gave no such promise because he did not make an "emergency" request, and that "urgent" meant that the X-rays should have been taken within fourteen days.  ECF No. 63-3 ¶ 5.  Furthermore, Champen asserts that plaintiff did not complain of jaw pain or the inability to chew food and looked well nourished.  *Id.*

On June 23, 2010, nondefendant Dr. McAllister examined plaintiff.  ECF No. 71-1 at 22.  He complained of shoulder pain and jaw soreness while chewing.  *Id.*; ECF No. 71 ¶ 11.  The medical report from this visit states that his jaw soreness was "better."  ECF No. 71-1 at 22.  According to plaintiff, he asked Dr. McAllister for a soft meal diet, but he turned him down and said that he was still waiting for the X-rays that Champen ordered.  ECF No. 71 ¶ 11.  Plaintiff weighed 150 pounds at this visit.  ECF No. 71-1 at 22.  This meant that he lost five pounds in the three weeks since his visit with Champen.  *Id.* at 19, 22.

On July 2, 2010 and July 8, 2010, plaintiff submitted health care services request forms complaining of pain to various body parts.  ECF No. 71-1 at 24–25.  These included his shoulder and right cheekbone and/or jaw when chewing food.  *Id.*  In these forms, he did not request a liquid or soft meal diet, but rather, treatment for pain.  *Id.*

On July 9, 2010, Champen examined plaintiff.  ECF No. 71-1 at 29.  He again complained of pain to various body parts, including his shoulder and cheekbone and/or jaw.  *Id.*  Champen prescribed Tylenol 3 for ten days for pain.  *Id.*; ECF No. 71 ¶ 13.  He also ordered X-rays, noting that the ones he ordered at the June 2, 2010 appointment had not been completed.  ECF No. 71-1 at 29.  He states that he was not aware that his order for X-rays had not been processed.  ECF No. 63-3 ¶ 7.  Further, he states that he had no control over the scheduling of urgent X-rays and that it was "entirely up to the utilization management nursing staff to take the request/order . . . and process it with the radiology staff."  *Id.*  Champen observed that plaintiff looked well nourished, that his vital signs were normal, and that he had no visible swelling to his jaw.  *Id.* ¶ 6; ECF No. 71-1 at 29.

Plaintiff asserts that, at this visit, he asked for a soft meal diet.  ECF No. 71 ¶ 13.  Champen disputes this assertion, stating that he wanted only pain medication.  ECF No. 63-3 ¶ 6.

On or about July 14, 2010, plaintiff submitted a first level appeal.  ECF No. 15 at 59–60.  Therein, he made the following relevant complaints: (1) he had pain in his shoulder; (2) he had pain in his cheekbone/jaw and believed that it was broken; (3) the X-rays that Champen ordered had yet to be completed; (4) he wanted the X-rays on his cheekbone/jaw to diagnose the source of his pain; (5) he could not chew properly due to the pain in his cheekbone/jaw and, therefore, he

4

had lost thirteen pounds; (6) he wanted a high-calorie liquid drink; and (7) the regular Tylenol that Dr. Sabin prescribed did not alleviate his pain.  *Id.*

On July 19, 2010, plaintiff went to CMF's clinic for X-rays of, *inter alia*, his "[f]acial bones" and "[o]rbits."  *Id.* at 68.  He asserts, and defendants do not seem to contest, that X-rays were not taken of his jaw.  *See, e.g.*, *id.* at 67.

Thereafter, he was taken to the emergency room, where Dr. Osman examined him.  ECF No. 63-4 ¶ 5.  He complained of pain.  *Id.*  His X-rays showed that he had a "minute fracture in the right zygomatic arch of his face."  *Id.*  "The zygomatic arch is a bone that sits just below the ear, but is not on the jaw bone."  *Id.*  Dr. Osman states that he did not "complain of difficulty eating or chewing food."  *Id.*  Further, he states that the fracture was not medically significant and that "a fracture in the zygomatic arch but not on the jaw bone was unlikely to cause pain in the jaw while chewing."  *Id.*

Dr. Osman also states that plaintiff complained of headaches.  *Id.*  Therefore, in his words, he referred plaintiff to Doctor's Medical Center in San Pablo ("the Center") "for evaluation and a CT scan[] to check for head injury."  *Id.*  Plaintiff seems to dispute this assertion in part.  He states that Dr. Osman referred him to the Center after seeing that he still complained of pain to his face, shoulder, and head that resulted from no medication.  ECF No. 71 ¶ 16.

On the same day, plaintiff was taken to the Center, where nondefendant Dr. Carson ordered a CT scan.  The diagnostic report showed a "nondisplaced segmental fracture of the right zygomatic arch."  ECF No. 63-3 at 33–34.  Furthermore, according to Dr. Osman, the report indicated that his facial pain was likely attributable to a sinus infection.  ECF No. 63-4 ¶ 5; *see also* ECF No. 63-3 at 31–33.  Additionally, Dr. Carson prescribed a five-day supply of Vicodin.  ECF No. 63-3 at 41; ECF No. 71 ¶ 17.

Defendants assert that plaintiff did not complain about the inability to chew properly at the Center.  ECF No. 63-2 at 5.  Further, they assert that Dr. Carson did not prescribe a liquid or soft meal diet.  *Id.*  Plaintiff disputes these assertions.  ECF No. 71-2 at 5.  He notes that Dr. Carson gave him general discharge instructions.  ECF No. 15 at 74.  Pertinently, the instructions state:  "If you have facial pain when eating, avoid crunchy or chewy foods.  A softer diet will be

5

1   more comfortable for the first 2–3 weeks." *Id.* Yet the medical records for this visit did not

2   contain a specific order for a soft meal diet. ECF No. 75-2 ¶ 7; *see* ECF No. 71 at 13 (noting that

3   the instructions were "general" and "just a simple common instruction").

4          Later that day, Jolly met with plaintiff when he returned to CMF. ECF No. 71 ¶ 18; ECF

5   No. 63-3 at 42. She changed Dr. Carson's prescription for Vicodin to Tylenol 3 because Vicodin

6   was not authorized at CMF. ECF No. 63-2 at 5; ECF No. 71 ¶ 19. She prescribed the Tylenol 3

7   for ten days and instructed plaintiff to see his primary care provider in five days. ECF No. 63-3 at

8   42–43, 46.

9          On July 23, 2010, plaintiff had a follow-up appointment with Champen. *Id.* ¶ 8. He

10  stopped the Tylenol 3 and switched plaintiff to Gabapentin 300 mg, a stronger medication. *Id.*

11  Champen states that he made this change because plaintiff continued to complain of facial pain

12  and said that the Tylenol 3 did not help. *Id.* Plaintiff contends that the Gabapentin was for his

13  shoulder pain. ECF No. 71 ¶ 20.

14         At this visit, according to Champen, plaintiff did not complain of difficulty chewing. *Id.*

15  However, because he allegedly stated that he still had facial pain, Champen instructed him to tell

16  the nurse if he had difficulty chewing and to return to the clinic in three weeks. *Id.* Further,

17  Champen states that plaintiff did not request a liquid diet. *Id.*

18         Plaintiff does not clearly state that he complained of difficulty chewing at this

19  appointment. ECF No. 71 ¶ 20; ECF No. 71-1 at 5. However, he contends that Champen should

20  have reviewed his medical file, which would have apprised Champen that a soft meal diet was

21  indicated. ECF No. 71-1 at 5.

22          At the same visit, Champen again requested a consultation with an orthopedic surgeon

23  due to plaintiff's continued complaints of shoulder pain. ECF No. 63-3 ¶ 8. Champen recorded

24  plaintiff's weight as 145 pounds. ECF No. 71-1 at 38. This was ten pounds less than the weight

25  he recorded during his June 2, 2010 evaluation of plaintiff. *Id.*; ECF No. 71-1 at 19.

26         On July 28, 2010, plaintiff requested a stronger dosage of Gabapentin. ECF No. 63-2 at 5;

27  ECF No. 71-2 at 5. He submitted another health care request form on July 31, 2010. *Id.* He did

28  not ask for a soft meal or liquid diet in either request. *Id.*

On August 6, 2010, plaintiff had an appointment with Champen.  ECF No. 71-1 at 40.
Champen increased his dosage of Gabapentin.  ECF No. 63-3 at 50.  Plaintiff weighed 141
pounds at this appointment.  ECF No. 71-1 at 40.  He asserts that he complained that his jaw hurt
and that he was having a hard time chewing, wherefore a requested a soft meal diet.  ECF No. 71
¶ 21.  Champen contends that he did not ask for a soft meal diet.  ECF No. 63-3 ¶ 9.

On August 10, 2010, plaintiff was transferred to the Center regarding continued
complaints that he had a broken jaw that caused him pain while chewing.  ECF No. 63-3 at 60.
Nondefendant Dr. Serebrakian examined him.  *Id.*  Dr. Serebrakian diagnosed him with a
"[m]ildly displaced zygomatic arch fracture since May 2010 . . . and . . . significant pain and
discomfort upon chewing."  ECF No. 63-3 at 61.  Due to his finding that plaintiff had a "problem
with chewing," he recommended that [he] be placed "strictly on a soft diet for several weeks and
then gradually progress to a solid regular diet."  *Id.*  Plaintiff weighed 140 pounds at this
appointment, *id.* at 60, which meant that he had lost fifteen pounds since the June 2, 2010
appointment with Champen.

When plaintiff returned from the Center that day, Dr. Osman ordered a soft meal diet.
ECF No. 63-3 at 63.  The following day, Dr. Osman spoke with the dietitian.  ECF No. 71-1 at
67.  According to the dietitian's notes, he/she spoke with Dr. Osman and they agreed that the
"mainline" diet with a bottle of Boost was appropriate for plaintiff's condition.  *Id.*  Dr. Osman
states that one bottle of Boost "has sufficient nutrients to replace an entire meal."  ECF No. 75-2
at 5.  Yet plaintiff contends that "mainline" refers to regular food and that, despite ordering a
bottle of Boost, Dr. Osman did not follow Dr. Serebrakian's orders.  ECF No. 71 at 13.

On December 10, 2010, plaintiff had surgery on his shoulder.  ECF No. 15 at 97.
According to operation report, he had "multiple loose bodies with associated degeneration of the
left shoulder."  *Id.*  Further, the report states that his shoulder pain "could be on the basis of loose
body wear or on the basis of degenerative disease."  *Id.*  Additionally, the report states that the
surgery would "not result in resolution of the degenerative change."  *Id.*

/////

/////

7

**B.      Procedural Background**

Plaintiff filed his amended complaint on October 30, 2014.  ECF No. 15.  He generally alleged that defendants inadequately and tardily diagnosed and/or treated his facial and shoulder injuries, accompanying pain, and inability to eat.  Based on this core allegation, he asserted a claim under the Eighth Amendment for deliberate indifference to his medical needs.[2]

Defendants have moved for summary judgment.  ECF No. 63.  They argue that Dr. Osman is entitled to summary judgment because his "role in [p]laintiff's medical care was limited and even then, [he] did everything he was supposed to do to address [his] needs."  ECF No. 63-1 at 2. They further maintain that, "[a]s the emergency room doctor and not his primary care doctor, Dr. Osman was not responsible for ensuring continuity of care for [p]laintiff's chronic pain problems."  *Id.*  Likewise, they argue that plaintiff's claim against Champen fails because he "prescribed pain medication, ordered an X-ray for his face when [he] complained of headaches, and referred [him] for an orthopedic consult for his chronic left shoulder pain."  *Id.* at 3.  Further, they argue that Champen was not aware of the delay in the processing of plaintiff's X-rays and that, even had he been, he did not control their scheduling.  *Id.*  Defendants add that they enjoy qualified immunity because they did not violate clearly established law and their actions were reasonable under the circumstances.  *Id.*

In his opposition, ECF Nos. 71, 73, plaintiff makes the following factual contentions, which he argues show that defendants were deliberately indifferent:

1.      Dr. Osman medically cleared him for placement in Ad-seg without conducting a face-to-face examination of his injuries.

2.      Dr. Osman failed to review his medical file to ensure that he continued to receive the Tylenol that Dr. Sabin prescribed before the May 21, 2010 altercation.

3.      Dr. Osman delayed in prescribing a soft meal diet after the July 19, 2010 X-rays revealed that he had a facial fracture.

*/////*

---

[2] Plaintiff filed a second amended complaint clarifying his allegations against defendant Nathanial Elam, ECF No. 50, which is the subject of the pending findings and recommendations, ECF No. 65.

4.    Champen failed to prescribe medication and stopped medication that Dr. Sabin had already prescribed despite knowledge of his shoulder pain.

5.    Because Champen stopped the medication, plaintiff did not receive any pain medication from July 2, 2010 to July 19, 2010.

6.    Champen failed to ensure that the X-ray request was timely processed.

7.    Champen failed to order an X-ray of his jaw upon request.

8.    Champen failed to order a soft meal diet on request.

9.    Champen failed to order a soft meal even though the July 19, 2010 X-rays showed a facial fracture.

ECF No. 73 at 1–2.

## II.    Standard of Review

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50 (1986); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). At bottom, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Thus, the rule functions to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally, under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323;

9

*Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995) (per curiam).

A clear focus on where the burden of proof lies as to the factual issue in question is crucial to summary judgment procedures.  Depending on which party bears that burden, the party seeking summary judgment does not necessarily need to submit any evidence of its own.  When the opposing party would have the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim.  *See, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990).  Rather, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue.  *See Celotex*, 477 U.S. at 324 (citation omitted) ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file.").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *See id.* at 322.  In such a circumstance, summary judgment must be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in [Rule 56(a)], is satisfied."  *Id.* at 323.

To defeat summary judgment the opposing party must establish a genuine dispute as to a material issue of fact.  This entails two requirements.  First, the dispute must be over a fact(s) that is material, i.e., one that makes a difference in the outcome of the case.  *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  Whether a factual dispute is material is determined by the substantive law applicable for the claim in question.  *Id.*  If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment.  "[A] complete failure of proof concerning an essential element

of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Second, the dispute must be genuine.  In determining whether a factual dispute is genuine the court must again focus on which party bears the burden of proof on the factual issue in question.  Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual claim.  Conclusory allegations unsupported by evidence are insufficient to defeat the motion. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial.  *Anderson*, 477 U.S. at 248; *Devereaux*, 263 F.3d at 1076 (citations omitted).  More significantly, to demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such that a reasonable jury "could return a verdict for [him] on the evidence presented." *Anderson*, 477 U.S. at 248, 252.  Absent any such evidence there simply is no reason for trial.

The court does not determine witness credibility.  It believes the opposing party's evidence and draws inferences most favorably for the opposing party. *See id.* at 249, 255; *Matsushita*, 475 U.S. at 587.  Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences. *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 837 (9th Cir. 1991) (Kozinski, J., dissenting) (citing *Celotex*, 477 U.S. at 322).  If reasonable minds could differ on material facts at issue, summary judgment is inappropriate. *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  On the other hand, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).  In that case, the court must grant summary judgment.

/////

/////

1    **III.    Analysis**

2        The Eighth Amendment protects prisoners from inhumane methods of punishment and

3    inhumane conditions of confinement.  *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir.

4    2006).  Extreme deprivations are required to make out a conditions-of-confinement claim, and

5    "only those deprivations denying the minimal civilized measure of life's necessities are

6    sufficiently grave to form the basis of an Eighth Amendment violation."  *Hudson v. McMillian*,

7    503 U.S. 1, 9 (1992) (citation omitted).  "Prison officials have a duty to ensure that prisoners are

8    provided adequate shelter, food, clothing, sanitation, medical care, and personal safety."  *Johnson*

9    *v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (citations omitted).  "The circumstances, nature, and

10   duration of a deprivation of these necessities must be considered in determining whether a

11   constitutional violation has occurred."  *Id.*  "The more basic the need, the shorter the time it can

12   be withheld."  *Id.* (citations omitted).

13       To prevail on an Eighth Amendment claim predicated on the denial of medical care, a

14   plaintiff must show that: (1) he had a serious medical need; and (2) the defendant's response to

15   the need was deliberately indifferent.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see*

16   *also Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Here, defendants do not argue that plaintiff's

17   medical needs were not objectively serious.  ECF No. 63-1 at 9–14.  Therefore, the court

18   considers only whether their response to his medical needs was deliberately indifferent.

19       For a prison official's response to a serious medical need to be deliberately indifferent, the

20   official must "'know[] of and disregard[] an excessive risk to inmate health.'"  *Peralta v. Dillard*,

21   744 F.3d 1076, 1082 (9th Cir. 2014) (en banc) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837

22   (1994)).  "[T]he official must both be aware of facts from which the inference could be drawn

23   that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511

24   U.S. at 837.

25       It is well established that "a mere difference of medical opinion . . . [is] insufficient, as a

26   matter of law, to establish deliberate indifference."  *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th

27   /////

28   /////

1  Cir. 2004) (alterations in original) (citation omitted).[3]  This rule applies whether the difference is

2  between the medical professional(s) and a prisoner or two or more medical professionals.[4]

3          In appropriate cases, however, a prisoner may state a claim of deliberate indifference to

4  medical needs based on a difference of medical opinion.  To do so, the prisoner must show that

5  "the course of treatment the doctors chose was medically unacceptable under the circumstances,"

6  and that they "chose this course in conscious disregard of an excessive risk to [the prisoner's]

7  health."  *Jackson*, 90 F.3d at 332 (citations omitted).  Under this rule, denying an inmate a kidney

8  transplant based on "personal animosity" rather than "honest medical judgment" would constitute

9  deliberate indifference.  *Id.*

10          **A.      Dr. Osman**

11          Here, plaintiff has not presented evidence upon which a reasonable jury could conclude

12  that Dr. Osman was deliberately indifferent to plaintiff's medical needs.  The record demonstrates

13  that Dr. Osman treated plaintiff on the day of the fight, ordering bandage changes and antibiotics

14  for his hand, cetirizine and tetanus shots, and morphine for pain.  He also ordered Tylenol 3,

15  which is a "potent pain medication."  ECF No. 75-2 ¶ 5.  While plaintiff seems to dispute that he

16  received the Tylenol 3, his medical records reflect otherwise.  ECF No. 63-3 at 44.  More to the

17  point, even if plaintiff failed to receive this medication, the evidence shows that Dr. Osman, as an

18  emergency room ("ER") physician, was not "responsible for" administering it to him.  *McGuckin*

19  *v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v.*

20  *Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also* ECF No. 63-4 ¶ 3; ECF No. 75-2 ¶ 3.  While

21  /////

22

---

23          [3] *See also Estelle*, 429 U.S. at 107; *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir.
   2016) (citation omitted); *Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014) (citation

24  omitted); *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citation omitted); *Jackson v.*
   *McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)

25  (citing cases); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Randall v. Wyrick*, 642
   F.2d 304, 308 & n.9 (9th Cir. 1981) (citing cases); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th

26  Cir. 1970) (per curiam); *Stiltner v. Rhay*, 371 F.2d 420, 421 n.3 (9th Cir. 1967).

27          [4] *Hamby*, 821 F.3d at 1092 (citation omitted); *Colwell*, 763 F.3d at 1068 (citation

28  omitted); *Snow*, 681 F.3d at 987 (citation omitted).

1    plaintiff may dispute the indication in the medical records that he received the Tylenol 3, Dr.

2    Osman clearly ordered it.

3            Additionally, while plaintiff asserts that Dr. Osman did not examine plaintiff in person,

4    the evidence shows otherwise.  ECF No. 15 at 39; ECF No. 63-2 at 16–19; ECF No. 63-4 ¶ 3;

5    ECF No. 75-2 ¶ 4; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties

6    tell two different stories, one of which is blatantly contradicted by the record, so that no

7    reasonable jury could believe it, a court should not adopt that version of the facts for purposes of

8    ruling on a motion for summary judgment.").  In short, Dr. Osman's actions during this

9    examination do not suggest deliberate indifference.

10           Nor does Dr. Osman's alleged failure to review plaintiff's medical file to ensure that he

11   received the regular Tylenol constitute deliberate indifference.  This argument presupposes that

12   Dr. Osman had an ongoing duty to review plaintiff's medical file.  However, Dr. Osman declares

13   that he was an ER physician and was not responsible for plaintiff's primary care.  ECF No. 63-4

14   ¶ 3; ECF No. 75-2 ¶ 4.  Plaintiff has not shown otherwise.  In any event, plaintiff's argument

15   implies that Dr. Osman was not actually aware of plaintiff's alleged failure to receive the

16   medication and, hence, does not suggest deliberate indifference.  Rather, at best, it implies

17   negligence, which is insufficient to support a claim of deliberate indifference.  *Estelle*, 429 U.S. at

18   106.

19           Similarly, Dr. Osman's delay in prescribing a soft meal diet after the discovery of

20   plaintiff's facial fracture was not deliberately indifferent.  Although Dr. Osman learned of the

21   fracture on July 19, 2010, he states that it was medically insignificant and that "a fracture in the

22   zygomatic arch . . . was unlikely to cause pain . . . while chewing."  ECF No. 63-4 ¶ 5.  True,

23   plaintiff states that he complained to Dr. Osman about such pain, and the evidence could support

24   a finding that his facial fracture caused him such pain, and plaintiff states that he requested a soft

25   meal diet at the July 19 appointment, but he has not shown that Dr. Osman's contrary opinion did

26   not reflect his honest medical judgment.  Plaintiff has not presented evidence that could support a

27   finding that Dr. Osman was not acting on the basis of a good faith medical judgment.

28   /////

1  Furthermore, Dr. Osman referred plaintiff to the Center for further evaluation after diagnosing the

2  fracture.  While the parties dispute his exact reason for doing so, this action does not suggest

3  deliberate indifference.  Granted, Dr. Carson's discharge instructions stated that a "softer diet"

4  would be more comfortable for two to three weeks if the fracture was causing facial pain, ECF

5  No. 15 at 74, but as plaintiff acknowledges, the instructions were general, ECF No. 71 at 13, not a

6  specific order for a soft meal diet.[5]  ECF No. 75-2 ¶ 7.

7            Ultimately, Dr. Osman followed Dr. Serebrakian's subsequent order for a soft meal diet.

8  But difference is that Dr. Serebrakian specifically ordered a soft meal diet and plaintiff does not

9  dispute that.  *See* ECF No. 75-2 ¶¶ 7–8; *see also* ECF No. 63-3 at 62.  Furthermore, unlike Dr.

10  Carson's comment in the discharge instructions that softer diet would be more comfortable over

11  the next two to three weeks if pain persisted, Dr. Osman actually received Dr. Serebrakian's

12  specific order for a soft diet.  Again, it is significant that Dr. Osman was an ER doctor and was

13  not responsible for plaintiff's primary care, including reviewing the paperwork of "inmate

14  patients returning from offsite health care appointments."  ECF No. 75-2 ¶ 7.  While the record

15  does not reflect why he reviewed Dr. Serebrakian's order, the fact that he assumed a

16  responsibility that he did not ordinarily handle does not, per se, support a reasonable finding that

17  he should have received, or actually received, Dr. Carson's order.  At most, such irregularities

18  sound in negligence, not deliberate indifference.  *Cf. Estelle*, 429 U.S. at 106–07.

19            Nor does Dr. Osman's decision to order a regular diet with a bottle of Boost show

20  deliberate indifference.  He declares that Boost "has sufficient nutrients to replace an entire

21  meal."  ECF No. 75-2 ¶ 8.  Further, he declares that "a registered dietitian . . . confirmed that

22  Boost [was] okay."  *Id.*  Plaintiff has not shown otherwise, and does not even assert that he lost

23  weight after Dr. Osman ordered the Boost.  Yet plaintiff notes that Dr. Serebrakian ordered a

24  "*strictly* soft diet."  ECF No. 63-3 at 62 (emphasis added).  In his estimation, a diet of regular

25  food and Boost contravened this order because (1) regular food is not soft and (2) Boost is not

26  _____

27            [5] Moreover, Dr. Osman states that no nurse notified him of Dr. Carson's statement about a soft meal diet, *see id.*, and plaintiff has not shown otherwise.  Further, even had a nurse notified

28  him of such an order and he failed to follow it, this would have amounted to a mere disagreement of medical opinion, which does not establish deliberate indifference.

soft food.  However, assuming that Boost is not soft food, Dr. Osman's decision to order it would constitute a mere disagreement in medical judgment.

For these reasons, plaintiff has not presented evidence upon which a reasonable jury could conclude that Dr. Osman was deliberately indifferent to plaintiff's medical needs.  Accordingly, summary judgment must be granted to Dr. Osman on plaintiff's deliberate indifference claim.

**B.    Champen**

At the June 2, 2010 appointment, which was Champen's first interaction with plaintiff, he ordered a consultation with an orthopedic surgeon and urgent X-rays.  Furthermore, while he stopped his prescription for Tylenol, he ordered Tylenol 3 for ten days, which is a stronger pain medication.  *See* ECF No. 75-2 ¶ 5.  These actions do not reflect deliberate indifference.

Furthermore, while the evidence indicates that plaintiff did not receive pain medication from July 2, 2010 to July 19, 2010, he has not shown that Champen intended this outcome or was indifferent to the pain it allegedly caused him.  At the June 2 visit, Champen ordered Tylenol 3 for ten days and a follow-up visit in two weeks.  Dr. McAllister conducted this visit on June 23, and the record reflects that plaintiff had Tylenol 3 from June 2 until this visit.  ECF No. 63-3 at 45; ECF No. 71-1 at 26.  Furthermore, Dr. McAllister appears to have ordered Tylenol 3 at this visit, *see* ECF No. 71-1 at 22, and the evidence shows that plaintiff received Tylenol 3 through July 2, ECF No. 63-3 at 45; ECF No. 71-1 at 26.

While plaintiff allegedly did not receive Tylenol 3 from July 2/3 to July 19, he has not shown that Champen was responsible for this lapse.  Champen's June 2 prescription for Tylenol 3 evidently expired on July 2.  *See* ECF No. 71-1 at 26.  Yet he asserts, and the record reflects, that he was "one of several primary care providers" for plaintiff.  ECF No. 63-3 ¶ 3.  Indeed, plaintiff met with Dr. McAllister on June 23 for his follow-up visit to his June 2 visit with Champen. Assuming Tylenol 3 was the only medically acceptable alternative, plaintiff has not shown that Champen knew that other primary care providers would not order it for him.  Furthermore, Champen examined plaintiff on July 9 in response to his health care services requests on July 2 and July 8.  At this visit, Champen prescribed Tylenol 3 for ten days.  ECF No. 71 ¶ 13; 71-1 at 29.  While plaintiff allegedly failed to receive this medication until July 19, he has not shown that

16

1   Champen knew about this failure, or that he "had the power" to ensure that he received it. *See*

2   *McGuckin*, 974 F.2d at 1062.

3       Similarly, while Champen stopped plaintiff's prescription for Tylenol on June 2, he has

4   not shown that Champen knew that this action would cause him to go without *any* pain

5   medication at a later date.  After all, Champen prescribed Tylenol 3, a stronger medication, at that

6   visit.  And, while the order was for only ten days, he scheduled a follow-up visit and was not the

7   only provider responsible for plaintiff's primary care.  It also bears emphasis that plaintiff stated

8   in his first level appeal that the regular Tylenol that Champen stopped did not alleviate his pain.

9   ECF No. 15 at 59.  Therefore, even had Champen knowingly failed to ensure that plaintiff

10  received it, one must question whether this failure harmed him.  In short, Champen was not

11  deliberately indifferent to plaintiff's failure to receive pain medication from July 2/3 to July 19.

12      Nor was Champen deliberately indifferent to the delay in the processing of his X-ray

13  request.  As indicated, a prisoner cannot establish a deliberate indifference claim where, as here,

14  "[t]here is no evidence that [the provider] was responsible for the failure to promptly perform the

15  [X-ray][.]" *McGuckin*, 974 F.2d at 1062.  Here, Champen declares that he had no control over

16  the scheduling of X-rays and that it was "entirely up to the utilization management nursing staff

17  to take the request/order . . . and process it with the radiology staff."  ECF No. 63-3 ¶ 7.  Plaintiff

18  has not shown otherwise.  Furthermore, a provider's failure to order "an X-ray or additional

19  diagnostic techniques" usually does not constitute deliberate indifference.  *See Estelle*, 429 U.S.

20  at 107.  In this case, Champen actually ordered the X-rays on June 2, and again on July 9 when he

21  learned about the processing delay.  If a provider's failure to order X-rays usually does not

22  constitute deliberate indifference, it follows that ordering X-rays and reordering them upon

23  learning about the delay does not constitute deliberate indifference.

24      Plaintiff's claim that Champen acted with deliberate indifference by failing to order an X-

25  ray of his jaw, in contrast to his facial bones, fails for similar reasons.  Based on his findings at

26  the June 2 and July 9 appointments (e.g., that there was no visible swelling in his jaw), Champen

27  concluded that there was no need for an X-ray of plaintiff's jaw.  *See* ECF No. 63-3 ¶¶ 5–6.

28  /////

Plaintiff may dispute Champen's findings, "[b]ut the question whether an X-ray . . . is indicated is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107.  In any event, there is no objective medical evidence that plaintiff's jaw, in contrast to his right zygomatic arch, was broken.  *See* ECF No. 63-3 ¶ 9; ECF No. 63-4 ¶ 5.  Plaintiff's contrary contention is speculative.

Nor does Champen's failure to order a soft meal diet constitute deliberate indifference. While the parties dispute whether plaintiff complained about chewing pain at the June 2 visit, Champen states that he appeared well nourished.  Furthermore, Champen prescribed him Tylenol 3, "a narcotic, and potent pain medication."  ECF No. 75-2 ¶ 5.  Therefore, assuming the alleged chewing pain stopped him from eating regular food, he has not shown that Champen actually "dr[ew] th[is] inference."  *Farmer*, 511 U.S. at 837.

For similar reasons, Champen's actions at the July 9 examination do not arise to deliberate indifference.  Champen states that plaintiff looked well nourished and that he had no visible swelling to his jaw.  Furthermore, he ordered more Tylenol 3 for pain.  Granted, plaintiff states that he complained of difficulty chewing and asked for a soft meal diet.  Furthermore, he apparently had lost at least five pounds since the June 2 visit.  *See* ECF No. 71-1 at 19, 22. Nonetheless, the evidence is insufficient for a reasonable juror to conclude that Champen actually inferred that jaw pain prevented him from eating regular food.  Put differently, his mere disagreement with Champen's treatment decisions does not establish deliberate indifference.  *See supra* at 13 & nn. 3–4; *see also Estelle*, 429 U.S. at 107 (complaint "based solely on the lack of diagnosis and inadequate treatment of . . . back injury" did not state claim for deliberate indifference).

Likewise, Champen's actions at the July 23 visit do not constitute deliberate indifference. At this interaction, he switched plaintiff to Gabapentin 300 mg, which is a stronger pain medication than Tylenol 3.  He declares that he made this change because plaintiff complained of facial pain and said that Tylenol 3 did not help.  Although plaintiff asserts that the Gabapentin was for shoulder pain, not facial pain, this assertion is conclusory and unsupported.  In short, the evidence shows that Champen sought to treat the pain that allegedly prevented plaintiff from

/////

1    eating properly.  Indeed, plaintiff does not even clearly state that he complained of difficulty

2    eating at this visit.  ECF No. 71 ¶ 20; ECF No. 71-1 at 5.

3         All the same, plaintiff contends that Champen should have reviewed his medical file,

4    which would have apprised him that a soft meal diet was indicated.  By this, plaintiff apparently

5    means that Champen would have seen: (1) that he had complained about jaw pain and problems

6    chewing; (2) his diagnosis of a facial fracture; (3) Dr. Carson's discharge instructions; and (4)

7    that he had lost ten pounds since June 2.  However, regarding item (1), the evidence indicates that

8    Champen treated plaintiff's alleged jaw pain by switching him to an even stronger pain

9    medication.  Concerning item (2), the only objective medical evidence is that the fracture was

10   "just below his eye socket, not [on] his jaw."  ECF No. 63-3 ¶ 9.  As for item (3), as discussed

11   above, the instructions were general and did not contain a specific order for a soft meal diet.  And,

12   while plaintiff's weight loss is undisputed, he has not shown that failing to prescribe a soft meal

13   diet despite a ten-pound weight loss over seven weeks was "medically unacceptable under the

14   circumstances.  In other words, he has not shown that Champen's failure to order a soft meal diet

15   was anything more than "an inadvertent failure to provide adequate medical care."  *Estelle*, 429

16   U.S. at 105.  Again, that applicable standard is that under the Eight Amendment, not a tort claim

17   for medical negligence.

18        Champen's actions at the August 6 visit do not constitute deliberate indifference for

19   essentially the same reasons that his actions at the July 23 visit do not.  He increased plaintiff's

20   dosage of Gabapentin, which does not suggest that he disregarded his jaw pain.  Plaintiff states

21   that he complained of difficulty chewing and requested a soft meal diet, and he had lost four more

22   pounds since the July 23 visit.  But, to reiterate, he has not shown that ordering a soft meal diet

23   sooner was the only medically acceptable course of action.  He might respond that the subsequent

24   orders of Drs. Serebrakian and Osman for a soft meal diet show otherwise.  But differences in

25   opinion between medical professionals do not prove deliberate indifference.  Further, they issued

26   these orders after Champen's last interaction with plaintiff and there is no indication that

27   Champen knew of them.

28   /////

Finally, a jury could not reasonably conclude that Champen—or Dr. Osman—was deliberately indifferent to plaintiff's shoulder pain. Overall, the evidence shows that plaintiff: (1) was treated multiple times regarding his complaints of pain; (2) received several prescriptions for strong pain medications; (3) received various diagnostic tests such as X-rays, MRIs, and CT scans; (4) was sent to outside medical centers; and (5) had an operation on his shoulder. *See Estelle*, 429 U.S. at 107 (no deliberate indifference based on allegation that doctors inadequately diagnosed and treated back injury when plaintiff was seen by medical personnel seventeen times over three months and received treatment for all his medical problems). Furthermore, while there was a delay in plaintiff's orthopedic consultation, he has not clearly argued, much less shown, that defendants were responsible for it. Additionally, the report for his shoulder surgery states that it might not resolve his shoulder pain and he has not clearly alleged that it did. Thus, it is unclear that the ostensible delay in his shoulder surgery caused him "unnecessary . . . infliction of [further] pain." *Berg v. Prison Health Services*, 376 F. App'x 723, 724 (9th Cir. 2010).

For these reasons, plaintiff has not presented evidence that could reasonably support a jury's verdict that Champen was deliberately indifferent to plaintiff's medical needs. Accordingly, summary judgment should be granted to Champen on his deliberate indifference claim.[6]

**IV.   Conclusion**

For the foregoing reasons, IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF No. 63) be granted.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the

---

[6] Because defendants are entitled to summary judgment on the merits of plaintiff's claims that they violated his federal rights, it is unnecessary to consider their arguments that they enjoy qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

objections shall be filed and served within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated:  July 27, 2017.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

21